**<u>UNREDACTED TRANSCRIPT</u>**


IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION


UNITED STATES OF AMERICA      .
        .
VERSUS              .   NO. 1:10-CR-10006-JDB-1
        .   NO. 1:08-CR-10119-JDB-2
PAUL SCHLESSELMAN     .   JACKSON, TENNESSEE
        .     1:40 P.M.
. . . . . . . . . . . . . . . . .


SENTENCING HEARING
APRIL 15, 2010

BEFORE THE HONORABLE J. DANIEL BREEN,
U. S. DISTRICT COURT JUDGE


<u>APPEARANCES</u>

FOR THE UNITED STATES:      MR. LAWRENCE J. LAURENZI
                   U. S. ATTORNEY
                   800 FEDERAL BUILDING
                   167 NORTH MAIN STREET
                   MEMPHIS, TENNESSEE 38103

                   MR. JAMES W. POWELL
                   ASSISTANT U. S. ATTORNEY
                   300 FEDERAL BUILDING
                   109 SOUTH HIGHLAND AVENUE
                   JACKSON, TENNESSEE  38301

FOR THE DEFENDANT:          MS. DORIS RANDLE-HOLT
                   MR. DAVID BELL
                   ASSISTANT FEDERAL DEFENDERS
                   SUITE 200
                   200 JEFFERSON AVENUE
                   MEMPHIS, TENNESSEE 38103

COURT REPORTER:            CHRISTINE MARTIN, OCR, RPR
                   450 U. S. COURTHOUSE
                   111 SOUTH HIGHLAND AVENUE
                   JACKSON, TENNESSEE 38301

(Defendant present)

**THE COURT:**  Good afternoon.  We're set this afternoon in the matter of U. S. versus Paul Schlesselman, 10-10006 and 08-10119 for sentencing.

Is the government ready to proceed this afternoon?

**MR. POWELL:**  We are, Your Honor.

**THE COURT:**  Is the defendant ready to proceed?

**MS. RANDLE-HOLT:**  Yes, Your Honor.

**THE COURT:**  All right, ladies and gentlemen, the court has received and reviewed the presentence report, which I believe both parties have inasmuch as there have been position papers submitted.

Mr. Powell, was there anything in addition that you needed to add or wish to bring to the court's attention?

**MR. POWELL:**  One thing, yes, Your Honor.  As the court will recall, there were a number of motions filed by Mr. Byrd.  On behalf of Mr. Schlesselman, his counsel had joined in on those motions.  At the last setting we addressed this matter, and those motions were withdrawn and the court entered an order, docket number 129, filed March 30th, dismissing those pending motions as to the codefendant, Daniel Cowart.  We would need to have the same disposition as to Mr. Schlesselman, I think, to clean up

SENTENCING HEARING
APRIL 15, 2010

the record, so --

THE COURT:  All right, sir.

MR. POWELL:  I discussed this with Ms. Randle-Holt before the court came out, and she is, I think, prepared to address the court.

THE COURT:  Is that agreeable, ma'am?

MS. RANDLE-HOLT:  Yes, Your Honor.

THE COURT:  What document number did you say it was?

MR. POWELL:  The order, Your Honor, was 129.

THE COURT:  129.  Okay.

MR. POWELL:  And I think it was probably addressed in the minutes of that --

THE COURT:  I'm sure.  I don't know, but the court will take care of that.

MR. POWELL:  Yes, Your Honor.

THE COURT:  Anything else?

MR. POWELL:  No, sir.

THE COURT:  All right, Ms. Holt, I'll hear from you, ma'am.

MS. RANDLE-HOLT:  Yes, Your Honor.  Your Honor, briefly, I'd like to call Doctor John Hutson.

THE COURT:  All right.

**JOHN ROBERT HUTSON, DEFENSE WITNESS, WAS SWORN**

**DIRECT EXAMINATION**

SENTENCING HEARING
APRIL 15, 2010

**BY MS. RANDLE–HOLT:**

Q    Doctor Hutson, if you would, state your full name for the court record.

A    John Robert Hutson.  That's H–u–t–s–o–n.

        **THE COURT:**  If you would, Doctor Hutson, even though I think I can hear you, the court reporter's got to take down everything, so, if you would, just move a little closer to that microphone.

        Thank you, sir.

        **THE WITNESS:**  Yes, sir.

**BY MS. RANDLE–HOLT:**

Q    Doctor Hutson, if you would, what is your profession?

A    I'm a clinical psychologist.

Q    And what is your education?

A    I have a Bachelor of Science degree in psychology from Ohio State University; a Doctor of Philosophy degree in clinical psychology from the University of Tennessee. I've been licensed as a psychologist in Tennessee since 1975.

Q    Doctor Hutson, have you ever testified in court before?

A    Yes.  I specialize in forensic psychology, which is advising attorneys and judges in different legal issues regarding clients.  I've done that since, really, 1974. I've testified many times.

Q    Doctor Hutson, as to Paul Schlesselman, did you ever have the opportunity to evaluate Paul Schlesselman?

A    Yes.  I met Mr. Schlesselman, sitting over here, in March of last year, and I saw him again in September of last year when he was up at Union City.

Q    Okay.

A    At your request.

Q    Now, based on your evaluation of Mr. Schlesselman, Doctor Hutson, could you make a determination whether he was pretty much a follower or a leader?

A    He was definitely a follower.  Mr. Schlesselman probably only initiated two things that I could identify in his life at that point; that is, he probably had as much or maybe a little bit more computer savvy or skills than most of his family.  He spent a lot of time on the computer.  He had a few friends, but I would not call those close friends.

And the other skill he developed is he had a real interest in firearms, and his goal was to become a gunsmith after he completed his education.  And he was somewhat unique in his family and in his community with regard to his knowledge there.

Other than that, he was a follower at school.  He was a follower in his family.  He followed basically what his sister and half-brother and father basically laid out for

USA V. PAUL SCHLESSELMAN

NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

him.  A very unoriginal individual.

Q     Doctor Hutson, can you kind of tell the court, what is Paul's, pretty much -- you know, we know he's young. What, pretty much, is his life exposure?  What is his life exposure?

A     It's actually hard for me to imagine how limited his exposure was.  Or is.  Although he indicated he's been in four different states, he's really been only with family members.  He has very little knowledge about even what direction they are.  He spent most of his time in a trailer park in Arkansas, eastern Arkansas, a little bit of time in the delta area of Mississippi with his mother.  His parents have been separated for -- divorced for some time.

He went to schools where he was -- or he and his sister or sometimes he and his sister and his brother were among the only white children there.  And I guess it's important to note that Paul was born with a cleft palate, and he felt he was always picked on and probably was picked on quite a bit.  Although he did make some friends, he was never the initiator of that.

Q     Okay.  Let me ask you this, Doctor Hutson.  Did he ever do exciting things that kids do, like go to fairs or -- I'm trying to get you to tell the court, what did he do?

A     This man had virtually no life outside his home.  As

SENTENCING HEARING  4/15/10
JOHN ROBERT HUTSON - DIRECT EXAMINATION BY MS. RANDLE-HOLT

USA V. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

I said, he had a few friends but he didn't really associate much.  He didn't travel.  If he did travel, it was with either one of his two parents, and usually it was a time of crisis in his family, traveling to avoid something or his father was looking for work or being taken off by his mother.

Q     What was the one thing, you know, in your evaluation of Paul that you learned that he really wanted to do with his father?

A     I thought kind of the essence of the thing that told me a lot about Paul is his father is a crop-duster, a pilot, and so I asked him, "Have you ever flown with your father?"

He said, "No.  It's something I always wanted to do."

And, you know, that didn't make sense to me.  I said, "Why didn't you fly with your father?"

"He never asked me."

He had asked his sister, and his sister had flown with the father, but Paul had never asked his father and his father never asked him, where it was something that would have been very easy to have done.  And that was probably what he identified to me as one of the greatest disappointments of his life at that point.

Q     In your assessment of him, what is the likelihood that Paul will be a danger to the community when he's

SENTENCING HEARING  4/15/10
JOHN ROBERT HUTSON – DIRECT EXAMINATION BY MS. RANDLE-HOLT

USA V. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

released?

A    Well, probably one of my biggest concerns -- and I wouldn't be coming down here today if I was uncomfortable. I think that Paul is a very naive individual.  When I first met him, I think it's important for the court to understand he didn't even look like he looks now.  He was pudgy.  He was socially inept.  I felt that most of the hatred and anger that he expressed was what he had learned from others, basically through his parenting and things that people had told him.  I didn't feel -- Although he had been picked on, he wasn't angry as a child.  He really didn't know much about what he was actually talking about in many cases with regard to some of his racial anger and hatred. I am really very comfortable with him.  I wasn't -- I was so unfrightened of him, I arm-wrestled him the first time I met him, just to point out how inept he was, and he couldn't beat me.  Maybe I shouldn't have told that in front of the court.  But I don't feel Paul is any significant risk at all.

Q    Do you have an opinion as to whether he should be housed with his codefendant?

A    No, he should not be.  Paul is still a very passive and impressionable individual.  I've learned since my last meeting and even at my last meeting in September that there's efforts to exert some manipulation and control over

him, and I'm concerned about where he may go.  He's impressionable by anybody.

          **MS. RANDLE-HOLT:**  No further questions, Your Honor.

          **THE COURT:**  Any questions from the government?

          **MR. LAURENZI:**  Just a few questions, Your Honor.

**CROSS-EXAMINATION**

**BY MR. LAURENZI:**

Q    Doctor Hutson, you mentioned that in your opinion that Mr. Schlesselman was a follower; is that correct?

A    That's correct, yes.

Q    And is that your opinion as it relates to the facts that are set out in this indictment?

A    I'm not sure I'm familiar now with the indictment.  I do know that Paul was instrumental in altering the shotgun. That was his skill.  With regard to any other -- the planning, even choosing the victims, I felt that he was pretty much led.

Q    Okay.  And could you maybe elaborate on that and tell me why that's your opinion that he was led.

A    The racial animosity that I saw in the indictment as Ms. Holt provided it to me and that I actually saw with Paul was not to the same degree, although I think it may have been if I had met him when he was maybe 10 to 12 years

USA v. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

old.  He seemed more isolated at this point than he did then when he was probably really victimized to some extent by his peers.

I think the significant thing was that this individual befriended him, gave him opportunity to travel, to talk about things that Paul knew about.  And by that, I mean the firearms.  And to engage in something that Paul thought was going to be important.

Q    And how did you learn that it was actually Cowart who was the one that actually planned this?

A    I kind of read that from the indictment and a little bit from what Paul told me.  I don't know Cowart.  I've never met him.

Q    And you've not talked to him; is that correct?

A    That's correct.

Q    In looking at Mr. Schlesselman's background, have you ever seen any situations where Mr. Schlesselman did take a leadership role?

A    No, absolutely not.

Q    You mentioned about the likelihood of violence, and can you tell us, what did you base your opinion on?

A    I based my opinion on psychological testing.  I interviewed him for a total of about five hours.  I reviewed notes of interviews with his family.  I've read his medical records when he was hospitalized as a young

USA v. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

man, when he was taken away from his family and put in a psychiatric facility in Arkansas.  And my impression, and I deal with a lot of criminal defendants, is I wasn't afraid of him.  That I saw most of his ideas that he was supposedly espousing is really things he didn't understand or grasp the importance of.  I really don't think the day I met him that he could pick the President out of a lineup in terms of -- And the plans were so absurd, I just -- I just didn't see the anger that I guess I see with people who are really frightening.  Or the coldness, emotional coldness.

Q     Of course you were aware that his room was plastered in pictures of firearms; is that correct?

A     Yes.

Q     And you --

A     And I questioned him about firearms.  Clearly he was knowledgeable.  He has read a lot.  I didn't find him that knowledgeable though about either the Aryan Nation movement or white supremacism other than things that he could -- things that apparently were part of this plot.

Q     But, of course, he did, in fact, hold himself out to be a white supremacist; is that correct?

A     He did, apparently, at the time of the plot.  He didn't with me.

Q     Did you, by chance, take a look at any of the e-mails that he had on his computer, any of the correspondence

USA v. PAUL SCHLESSELMAN 12
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

going back and forth with Mister --

A    If I may look a second, I may have some of that but I'm not absolutely certain.  I haven't looked at this whole file in some time.

No.  All I have were some letters that he had purportedly written back and forth to the family and stuff.

Q    So you did not take a look at what was retrieved off of his computer?

A    No, I did not.

**MR. LAURENZI:**  That's all the questions I have, Your Honor.

**THE COURT:**  Anything further, Ms. Holt?

**MS. RANDLE-HOLT:**  No, Your Honor.

**THE COURT:**  All right, Doctor Hutson, you can step down, sir.  Thank you.

Any additional proof, Ms. Holt?

**MS. RANDLE-HOLT:**  That's all we have, Your Honor.

**THE COURT:**  Anything the government wishes to present?

**MR. LAURENZI:**  No, Your Honor.

**THE COURT:**  I'll hear argument, I guess.  You can go ahead, Ms. Holt.  You're up there.

**MS. RANDLE-HOLT:**  Thank you, Your Honor.

Your Honor, I think it's important that we kind

SENTENCING HEARING  4/15/10
JOHN ROBERT HUTSON – CROSS-EXAMINATION BY MR. LAURENZI

USA v. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

of tell you a little bit about Paul.  And I know Your Honor has read the presentence report and you know all the details; but as the defense, we think it's so important that the court realize that at the time of these offenses Paul was 18 years old.  He had just turned 18 in September of two thousand -- I think the year before, 2008, and these offenses occurred like in October.

You've heard from Doctor Hutson, and Paul's life exposure was pretty much at home.  You're looking at someone that had a seventh-grade education.  He dropped out of school at the beginning of the eighth grade.  His life exposure was staying in the house with his little sister, watching TV, playing video games, and surfing the Internet. The Internet is what took him outside of his house, outside the trailer park where he lived.  And it just so happened Paul met these people on the Internet, people espousing hate, and he listened.  It was somebody to talk to.  He talked to them.  They talked back.  And these people were teaching him hate.

But we look at where he lived.  His mother had left him at the age of 6.  His father worked all the time just to support the family.  Who was teaching him how to love?  Who was teaching him to respect other people?  We're firm believers that you don't put children in the world and think good things are going to come out of them if you

SENTENCING HEARING
APRIL 15, 2010

USA V. PAUL SCHLESSELMAN    14
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

don't put good things into them.  But we had somebody on the Internet putting bad stuff into him, teaching him to not like people because of the color of their skin.  There was nobody teaching him to love and respect other people.

You know, he's gotten to meet people of color, me, people that he can talk to, people that's not trying to hurt him.  He's gotten to meet men that know how to be men, like his other counsel, Mr. Bell.  He got to meet Doctor Hutson and sit down and talk to him.  He's still impressionable.

We submit to the court he's salvageable.  Paul can be turned around, and we think he's already begun that process by admitting his guilt in this case.  He knows he did something wrong.  He knows he has to pay for that.  He's admitted that.  He's even told the government, you know, "I did this.  I'll even testify if you need me to testify."  That's a big step.

We ask this court to please accept the plea agreement in this case.  It's not unduly lenient based upon all the facts and circumstances and the fact that he was willing to testify, that this is the right thing to do, to impose a sentence of ten years for Mr. Schlesselman.

Thank you, Your Honor.

**THE COURT:**  Thank you.

Mr. Laurenzi?

SENTENCING HEARING
APRIL 15, 2010

**MR. LAURENZI:**  Your Honor, briefly.  We, too, would ask the court to accept the plea agreement.

We would tell the court that but for law enforcement getting involved in this case, I am confident that -- I'm not sure if 88 people would have been killed, but I am convinced at least one person would have been killed and probably more.

I know Doctor Hutson mentioned hatred.  When you take a look at the facts of this case, there is no doubt that this defendant, as well as his codefendant, had a great deal of hate, and a lot of that was directed at African Americans and at Jews.  And that they did, in fact, plan a very serious plot to, in fact, harm these people.

So we think that the ten years is an appropriate sentence.  I think when we do look at his record, he has not done any appreciable jail time at all, and so this is, in fact, a significant sentence, but it's also a significant set of facts that, in fact, justifies the sentence.

I would also tell the court that we did talk to Mr. Schlesselman.  It was understood that if his codefendant would have gone to trial that he would have testified.

We think when you take into account the totality of all of the facts that the plea agreement, which

USA v. PAUL SCHLESSELMAN                                                    16
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

requires a ten-year sentence for him to serve, is an appropriate sentence.

THE COURT: All right, sir, thank you.

All right, Mr. Schlesselman, the court will permit you to say anything if you wish to do so in your own behalf at this time.

Come up here to the podium, if you would, please.

Yes, sir.

THE DEFENDANT: Your Honor, I would first like to say I know what I did was wrong and I accept responsibility for everything I've done. Next, I know I made a mistake. I got involved with the wrong stuff. I'm going to use whatever time you give me to better my life.

THE COURT: All right, sir, thank you.

THE DEFENDANT: Thank you.

THE COURT: All right, in this matter Mr. Schlesselman has previously pled guilty to counts 2 and 7 in indictment 08-10119, count 2 charging him with conspiracy, in violation of 18 United States Code, Section 371, and in count 7 charging him with threatening to kill and/or inflict bodily harm upon a major candidate for President of the United States, in violation of 18 United States Code, Section 879.

He also entered a plea of guilty in information

SENTENCING HEARING
APRIL 15, 2010

USA v. PAUL SCHLESSELMAN     17
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

number 10-10006, count 1 of that information, possession of a firearm in furtherance of a crime of violence, in violation of 18 United States Code, Section 924(c)(1)(A)(i).

The court is, of course, utilizing the guidelines in this case as advisory.  In doing so, I'm going to be referring to the 2009 guidelines manual.

First of all, with regard to indictment 08-10119, count 2, for the violation of 18 U.S.C., Section 371, the court refers to Section 2X.1(a) where the base offense level is from the -- is determined from the guideline for the substantive offense plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.  The court is making reference to Section 2A1.5 for conspiracy to commit murder, in violation of 2A1.5(a).  The base offense level in that certain situation would be an offense level 33.

Under Section 3A1.1(a), the offense level is increased by three levels because the defendant selected a class of persons or intended victims of the offense -- for the offense of conviction based upon the actual and perceived race, color, religion, national origin or ethnicity of that class of persons, which would increase the level, as I indicated, by three.  That would give him an adjusted offense level of 36.

SENTENCING HEARING
APRIL 15, 2010

USA V. PAUL SCHLESSELMAN    18
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

As far as count 7 is concerned -- this is, again, in 08-10119 -- under Section 2A6.1(a)(1), for threatening or harassing communications, would place him in an offense level of 12.  And again, Section 3A1.1(a), which the court previously explained, would add three levels, giving him an adjusted offense level of 15 under that particular count.

Under the multiple count adjustment for count 2, where the offense level of 36 would provide one unit, that's under the application of Section 3D1.4(a); and count 7, with the offense level of 15, would not provide any units.  That's under the application of Section 3D1.4(c).  That would provide one unit; however, that would not be added in this case.  The greater adjusted offense level -- or offense level is 36, that being with regard to count 2.

And, Mr. Powell, you may have and I've forgotten, did the government file a motion for the full reduction for acceptance in this case, sir?

**MR. POWELL:**  I did not in this case, Your Honor, but to the extent that it's necessary, the government would move at this time orally for the defendant to be given full acceptance of responsibility.

**THE COURT:**  All right, sir, the court will grant your motion and provide Mr. Schlesselman the full three levels, which then gives him, under that particular

SENTENCING HEARING
APRIL 15, 2010

indictment, an offense level of 33.

Under the information, 10-10006, count 1, the offense basically sets forth a sentence of five years consecutive or in addition to any other sentence.

His criminal history category is zero points, which places him in criminal history category I.

Under that scenario, his advisory range would be 135 to 168, although his restricted range would be 120 months.

The court is also to consider the factors under 18 United States Code, Section 3553(a), which directs the court to impose a sentence sufficient but not greater than necessary to comply with the purposes set forth in paragraph (2) of the subsection.

The court, in assessing the sentence to be imposed, is to consider the nature and circumstances of the offense as well as the history and characteristics of the defendant.  Of course, the nature and circumstances of the offense, obviously, are quite disturbing, quite -- well, I suppose, based on my recollection, it was probably -- there had been some other threats towards the President, I guess, either now or prior to his being elected President, but I think this is one of the first that I recall.  It was very -- The facts of the situation were very frightening because not only of those threats but threats being made

USA V. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

and potentially, certainly, significant harm to be inflicted upon African Americans and Jewish individuals, persons being robbed.  And frankly, just the whole scenario, I suppose, if it hadn't been spelled out in the testimony and in statements, it would almost be too fantastical to even believe that this type of situation would have occurred.

But the problem is that, I think as Mr. Laurenzi indicated, had it not been stopped at the point that it was, it's really anyone's guess as to what exactly may have ultimately occurred.  It could have been very, very serious and very frightening.

So again, an extremely serious matter, and irrespective of who led and who followed and that type of thing, this particular young man was involved.  And based on the information the court's been provided in the presentence report and elsewhere, he was a participant in what was about ready to happen or potentially was ready to happen.  So again, a very, very serious and dangerous and frightening set of circumstances.

To a degree, it's offset by, frankly, Mr. Schlesselman's lack of criminal conduct.  I know he's had some matters, I think, where he's undergone some testing and treatment.  And as Doctor Hutson and, I think, the presentence report bears out, Mr. Schlesselman basically

SENTENCING HEARING
APRIL 15, 2010

had a very sheltered life, not much involvement or activity with the outside world.  And most of it, I think, was pretty much at home either watching TV or using the computer or whatever.  And I know his parents were divorced, and, obviously, those are always traumatic and have significant impacts upon, particularly, a young person.  But nonetheless -- The court can take this into consideration, but, nonetheless, it doesn't necessarily explain or absolve him, obviously, for the acts that he and his codefendant were in the process of committing or potentially going to commit had this conduct not been stopped.

The court is to consider a sentence that would reflect the seriousness of the offense, which I've addressed, promote respect for the law, and provide just punishment for the offense, which the court believes that in this case the sentence it will impose will do so.

Also, to afford adequate deterrence to criminal conduct.  That's basically to send a message to others and certainly Mr. Schlesselman himself that this type of activity is certainly to be avoided and certainly is not condoned, and I believe the sentence will act as a deterrent effect as well.

To protect the public from further crimes of the defendant is an aspect the court needs to consider.  I

SENTENCING HEARING
APRIL 15, 2010

would hope, as Mr. Schlesselman has indicated, he does recognize the errors of his ways and that he will -- during the time that he is incarcerated and certainly when he's released back into society, that he will move in a different direction, will certainly move -- and frankly, as I think I made a statement earlier this morning in another case, Mr. Schlesselman needs to be very particular about who he selects to be around.  Like I said, I had an 18-year-old young man this morning that I said the exact same thing to.  Regretfully, I have too many young people who have gotten involved with what I call the wrong crowd and then let themselves be led one way or the other.  But again, that doesn't absolve or excuse Mr. Schlesselman's actions, but it does -- I would hope if he would take this to heart that he would simply try to make wise choices in the future because it's important.  If you don't, regretfully, your future is not going to be very hopeful. And so I think I would simply just try to impose or impress upon you that piece of advice, if nothing else.  So, to some extent, the court will take that aspect into consideration.

And finally, provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.  As well, I would simply recommend, Mr. Schlesselman, that you

attempt while you are incarcerated to take advantage of whatever educational aspects or vocational training. I know that you dropped out, and I would hope that you would pick that back up and give yourself that opportunity because, frankly, education and training, to whatever degree you can get it, is going to be key to your success in the future. If you don't take advantage of it now, it's going to be hard for you to when you get out. Although I'm not saying you can't, but it's just going to be more difficult, so any type of --

And frankly, you can learn a trade. I've visited several federal facilities and, frankly, they do provide that opportunity. I've seen men and women take advantage of it and become very productive citizens. They really have. I'm not just telling you that. They really have. There are industries that actually operate inside the prison that provide tremendous opportunities for people to come out and be productive citizens, and I would hope you would take that to heart when you do -- wherever you are housed.

The court has a plea agreement that's been presented to it that suggests or recommends a particular sentence in this case. The court has given serious and very deliberate consideration to that recommendation. You know, again, it's a very tough, tough situation that the

USA v. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

court has to make these determinations, but in taking everything into consideration as far as the testimony I've heard and all of the documents that I have received and have heard other testimony in prior hearings, the court does believe -- and as Mr. Laurenzi indicated, Mr. Schlesselman, although it didn't come to pass, was available or ready, I believe, to testify had he been called upon to do so.  I'm going to follow the recommendation that has been presented to the court in the plea agreement, and what the court's going to do is impose the following sentence.

In 08-10119, with regard to counts 2 and 7, the court is going to impose a period of incarceration of 60 months each, on each count, to run concurrent.  And in count -- or, excuse me, in the information, 10-10006, that's count 1, the court is going to impose a sentence of 60 months, which would be consecutive to the previous indictment, for a total of 120 months.

The court is also going to impose a period of supervised release of 3 years as to each count, that is, in counts 2, 7 and count 1 in the information of 3 years, and that will run concurrent.

The court is also required to impose a period of -- excuse me, a $300 special assessment.

I will not impose any fine in this case.

SENTENCING HEARING
APRIL 15, 2010

While Mr. Schlesselman is on supervised release, the court is going to require, to the extent that probation feels it necessary, substance abuse testing and treatment, any type of mental health treatment, again, directed by the probation office.  I will also direct that he cooperate in the collection of DNA.

Ms. Holt, is there a request in terms of location of where he would like to be housed or try to be housed?  I can only make a recommendation, but I'll hear from you on that issue.

**MS. RANDLE-HOLT:**  Yes, Your Honor.  Your Honor, I'm asking the court, if the court would -- and I'm asking the United States to help us too.  I know that in reading the legal guide to the BOP last night that the United States Attorneys can make a recommendation to the BOP also. I would ask that he not be housed with the codefendant, if they would send a letter also.

And, Your Honor, I looked at two institutions. One is FCC Yazoo City, and one is the FCC at Forrest City. And I think they would provide some opportunities for him, and they won't be too far so that his father and his little sister can pay him a visit every now and then.

**THE COURT:**  Would the one in Arkansas be closer?

**MS. RANDLE-HOLT:**  From Helena, probably, yes,

SENTENCING HEARING
APRIL 15, 2010

it would probably be closer, the way Helena sits not far from 49.  And the institution at Yazoo City is off of Highway 49, and it's 36 miles north of Jackson.

**THE COURT:**  I'll make the recommendation that he -- What city is this, the one in Arkansas?

**MS. RANDLE-HOLT:**  It's in Forrest City.

**THE COURT:**  Forrest City.  I will make -- That will be the first choice.  I will make that as -- a recommendation of that.  Or if that's not possible, then the Yazoo City facility.

**MS. RANDLE-HOLT:**  Yes, Your Honor.

**THE COURT:**  And I will -- well, I guess that usually comes from -- Housing, I think, usually comes from your office, doesn't it?

**MR. LAURENZI:**  That is correct, Your Honor. Ms. Holt has talked to me about it, and we will continue to talk about it.  We recognize the seriousness of the situation.

**THE COURT:**  I think I would certainly recommend that your office take that to heart and try to do that to the extent you can.

**MR. LAURENZI:**  Yes, Your Honor.

**MS. RANDLE-HOLT:**  Also, Your Honor --

**THE COURT:**  Yes, ma'am.

**MS. RANDLE-HOLT:**  -- I think it would be real

important if it was noted in his judgment that the court recommends the GED program and vocational training for him, something to keep him busy during those --

THE COURT:  I'll make both of those recommendations, that he obtain his GED while he's incarcerated or, if not, then any -- he should, and then any type of vocational training that is available.

MS. RANDLE-HOLT:  And some mental health counseling.

THE COURT:  I'll make that recommendation too while he's incarcerated.

Anything else?

MS. RANDLE-HOLT:  That's it, Your Honor.  Thank you.

THE COURT:  All right, Mr. Powell or Mr. Laurenzi, either one, were there other counts that need to be addressed?

MR. POWELL:  Yes, Your Honor, and we would at this time move that the remaining counts in the superseding indictment be dismissed at this time.

THE COURT:  I'll grant your motion and dismiss the remaining counts as they pertain to Mr. Schlesselman.

Mr. Powell, were there any other objections as far as sentencing or any other matters I failed to address on behalf of the government, sir?

SENTENCING HEARING
APRIL 15, 2010

USA v. PAUL SCHLESSELMAN
NOS. 1:10-CR-10006-JDB-1; 1:08-CR-10119-JDB-2

**MR. POWELL:**  No, Your Honor.  Thank you.

**THE COURT:**  Ms. Holt, were there any other objections as far as sentencing or any other matters I failed to address on behalf of the defendant?

**MS. RANDLE-HOLT:**  No, Your Honor.

**THE COURT:**  There was a plea agreement in this matter, and I believe as part of that he agreed to waive his right to appeal his sentence.

**MR. POWELL:**  Yes, Your Honor.  That's in the plea agreement.

**THE COURT:**  The court, as I've indicated, will adopt the plea agreement, and I believe I've already determined that was freely and voluntarily made as far as that waiver.

All right, ladies and gentlemen, unless there's anything else at this time, Mr. Schlesselman, you'll be remanded to the custody of the Marshals office.

Thank you all.

All, right let's adjourn court.

(Proceedings concluded at 2:20 p.m.)

- - - - -

SENTENCING HEARING
APRIL 15, 2010

REPORTER'S CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the captioned matter in the United States District Court, Western District of Tennessee, Eastern Division.

**s/**Christine Martin, OCR

May 18, 2010